UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIEZER APONTE, ANA GARCIA, and
SHANNEL WALKER,

Plaintiffs,

-v-

DIEGO BEEKMAN M.H.A. HDFC,
VICKI BEEN, as Commissioner of the
NEW YORK CITY DEPARTMENT OF
HOUSING PRESERVATION AND
DEVELOPMENT, and BILL DE
BLASIO, as Mayor of the CITY OF NEW
YORK

Defendants.

16-CV-8479 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Eliezer Aponte, Ana Garcia, and Shannel Walker (collectively, "Plaintiffs")—three low-

income tenants in a Bronx apartment complex—have filed this lawsuit against their landlord,

Diego Beekman Mutual Housing Association Housing Development Fund Corp. ("Diego

Beekman"), as well as the Commissioner of the New York City Department of Housing

Preservation and Development and the Mayor of the City of New York (together, the "City

Defendants," and, with Diego Beekman, "Defendants").  Plaintiffs allege that Diego Beekman

has been charging them excessive rent, and that the City Defendants have enabled this practice

by failing to certify that Plaintiffs are eligible for a rent cap established by a regulatory

agreement between Diego Beekman and the City of New York.  Plaintiffs seek relief from all

Defendants pursuant to 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment's

Due Process Clause and from Diego Beekman alone under a variety of state-law theories.  Diego

Beekman and the City Defendants have now moved to dismiss all claims against them.  (Dkt.

Nos. 43, 50.)  For the following reasons, the motions are granted.

# I.     Background

## A.     Factual Background

The Court draws its factual recitation from the complaint's allegations and, where appropriate, from any documents the complaint incorporates by reference.  *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).

 In February 2003, Diego Beekman purchased a thirty-eight building, 1,219-unit Bronx housing complex (the "Complex") from the United States Department of Housing and Urban Development ("HUD").  (Dkt. No. 1 ("Compl.") ¶¶ 5, 11.)  Pursuant to the warranty deed that transferred title (the "Deed"), Diego Beekman agreed that until 2033 (1) all of the Complex's units would be dedicated to families with incomes no greater than 115% of the area median income, (2) 75% of the Complex's units would be dedicated to low- and very low-income families, and (3) rents for the low- and very low-income units would not exceed a specified cap.[1] (Compl. ¶ 14–15; Dkt. No. 56-1 at 13–14.)  The Deed further required Diego Beekman to notify its existing and future tenants about the Deed's terms.  (Compl. ¶ 16; Dkt. No. 56-1 at 24.)

Two later agreements placed further limitations on Diego Beekman's administration of the Complex.  First, Diego Beekman entered into a June 2006 "HOME Agreement" with the City of New York (the "City"), pursuant to which the City's Department of Housing Preservation and Development ("HPD") agreed to provide Diego Beekman with $13.6 million for the purpose of rehabilitating 321 of the Complex's units.  (Compl. ¶ 18; Dkt. No. 56-2 at 9, 20–21.)  In exchange, Diego Beekman was required, throughout the rehabilitation period and for at least five

---

[1] The Deed incorporates the definitions of low- and very low-income families set out in the Housing Act of 1937, Pub. L. No. 75-412, 50 Stat. 888, as amended.  (Dkt. No. 56-1 at 13.) Under these definitions, a "low-income" family is a family with an income no higher than 80% of the area median income, and a "very low-income" family is a family with an income no higher than 50% of the area median income.  42 U.S.C. §§ 1437a(b)(2)(A)–(B).

years thereafter, to cap the rent for those units and to rent them exclusively to low- and very low-income families.[2]  (Compl. ¶¶ 19–23; Dkt. No. 56-2 at 8–10.)

Second, in December 2009, Diego Beekman entered a regulatory agreement with the City (the "Regulatory Agreement") in exchange for a tax exemption.  (Compl. ¶ 24.)  That agreement, which is to remain in effect until 2048, contains a schedule of maximum initial rents applicable to all of the Complex's units and provides that any adjustments to the initial rents must comply with New York City's Rent Stabilization Code, N.Y.C. Admin. Code § 26-512.  (Compl. ¶¶ 24, 27; Dkt. No. 56-3 at 10, 86.)  Furthermore, for a "Cooperating Tenant"—defined as a tenant who has submitted certain income certifications and other financial documentation—the agreement holds out the possibility of a still lower rent cap, depending on the tenant's income level and whether or not the tenant receives federal housing benefits.[3]  (Compl. ¶¶ 26–29; Dkt. No. 56-3 at 7, 10–11.)  It is HPD's prerogative to determine, based on information provided by Diego Beekman, whether any given tenant is a Cooperating Tenant.  (Compl. ¶ 26; Dkt. No. 56-3 at 11.)  Finally, where a unit is subject to multiple rent or income restrictions, the Regulatory Agreement provides that the most restrictive condition shall govern.  (Compl. ¶ 30; Dkt. No. 56-3 at 11.)

Plaintiffs contend that Diego Beekman and the City, acting through HPD, have failed to satisfy their obligations under these various agreements.  As for Diego Beekman, Plaintiffs maintain that it has failed to notify its tenants of their eligibility for rent caps and that it often sets

_____

[2] The HOME Agreement defines "low-" and "very low-income" families by reference to certain HUD regulations rather than by reference to the Housing Act of 1937.  (Dkt. No. 56-2 at 9.)  For present purposes, the definitions contained in the regulations are materially identical to those contained in the Act.  *Compare* 24 C.F.R. § 92.2, *with* 42 U.S.C. §§ 1437a(b)(2)(A)–(B).

[3] The Regulatory Agreement also limits the number of units Diego Beekman may rent to tenants whose income exceeds certain specified benchmarks.  (Compl. ¶ 25; Dkt. No. 56-3 at 9.)

rents above the permitted maximum.  (Compl. ¶¶ 39, 41–42.)  And as for the City Defendants,

Plaintiffs allege that they have failed to issue the Cooperating Tenant designations that would

render qualifying tenants eligible for the special rent caps set out in the Regulatory Agreement.

(Compl. ¶ 40; Dkt. No. 54 at 12.)

Plaintiffs, each of whom has lived in the Complex since at least 2010, allege that they are

among those who have been injured by these alleged practices.  (Compl. ¶¶ 44, 55, 67.)

Plaintiffs maintain that they are each eligible for a Cooperating Tenant rent cap under the

Regulatory Agreement but that they have never been certified as Cooperating Tenants and that

their monthly rents have consistently exceeded that cap.  (Compl. ¶¶ 48, 50–52, 59, 61–63, 73,

75–77; Dkt. No. 54 at 12.)  In addition, Plaintiffs allege that they have never been notified as to

whether they live in units that are subject to the HOME Agreement's additional rent caps.

(Compl. ¶¶ 49, 60, 74.)  Plaintiffs have been unable to pay rent at the levels Diego Beekman has

set, and Diego Beekman has consequently filed non-payment actions—including some that are

currently pending—against each Plaintiff in Bronx Housing Court.  (Compl. ¶¶ 54, 66, 79.)

## B.    Procedural History

On October 31, 2016, with non-payment actions pending against each of them in state

housing court, Plaintiffs filed the instant federal suit.  (*See* Compl. ¶¶ 54, 66, 79.)  The complaint

asserts a single federal cause of action against Defendants, claiming that Defendants' failure to

provide notice of the various available rent caps or to certify Plaintiffs' status as Cooperating

Tenants violated the Fourteenth Amendment's Due Process Clause, and seeking relief pursuant

to 42 U.S.C. § 1983 ("Section 1983").  (Compl. ¶¶ 80–84; Dkt. No. 54 at 12.)  In addition, the

complaint asserts four causes of action under New York state law against Diego Beekman alone:

(1) breach of the Deed, the HOME Agreement, and the Regulatory Agreement, with respect to

each of which Plaintiffs are alleged to be third-party beneficiaries (Compl. ¶¶ 85–87); (2) breach

4

of Plaintiffs' leases, which allegedly incorporate the Regulatory Agreement by reference (Compl. ¶¶ 88–92); (3) commission of deceptive business practices in violation of state consumer-protection law, N.Y. Gen. Bus. Law, § 349 (Compl. ¶¶ 93–95); and (4) violation of New York City's Rent Stabilization Code, N.Y.C. Admin. Code § 26-512 (Compl. ¶¶ 96–98).

Diego Beekman and the City Defendants have each separately moved to dismiss the claims against them. (Dkt. Nos. 43, 50.) Defendants contend that Plaintiffs' claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a valid claim to relief.[4] (Id.) Defendants' motions have been fully briefed (Dkt. Nos. 45, 52, 54–55, 58, 62), and are fit for resolution.

## II.    Legal Standards

### A.    Rule 12(b)(1)

To the extent that Defendants seek to challenge this Court's subject-matter jurisdiction solely on the basis of the allegations in the complaint, Plaintiffs labor under "no evidentiary burden" to establish that the factual predicates to this Court's jurisdiction have been satisfied. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). Instead, this Court need only look to the complaint and ask whether it "allege[s] facts that affirmatively and plausibly suggest" that jurisdiction is proper. *Id.* (quoting *Amidax Trading Grp. V. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)). In resolving this question, the Court "accept[s] as true all

---

[4] Diego Beekman's motion also invokes Federal Rule of Civil Procedure 12(h)(3), which provides that a court must dismiss an action if it determines at any stage in the litigation that it lacks subject-matter jurisdiction. (Dkt. No. 50.) But because Diego Beekman has raised its jurisdictional defense before filing a responsive pleading to Plaintiffs' complaint, Rule 12(b)(1) provides sufficient authority for Diego Beekman's motion to dismiss.

allegations in the complaint and draw[s] all inferences in [Plaintiffs'] favor." *Doe No. 1 v. Putnam Cty.*, No. 16 Civ. 8191, 2018 WL 4757967, at *4 (S.D.N.Y. Sept. 29, 2018).

But to the extent that Defendants "proffer[] evidence beyond the [complaint]" in order to raise a "fact-based Rule 12(b)(1) motion," Plaintiffs must "come forward with evidence of their own" if Defendants' evidence "'reveal[s] the existence of factual problems' in the assertion of jurisdiction." *Carter*, 822 F.3d at 57 (quoting *Exhange Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). In this scenario, Plaintiffs carry "the burden of proving by a preponderance of the evidence that [subject-matter jurisdiction] exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

### B.     Rule 12(b)(6)

To survive Defendants' Rule 12(b)(6) motions, Plaintiffs' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, Plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citation and footnote omitted).

## III.     Discussion

### A.     Subject-Matter Jurisdiction

Both Diego Beekman and the City Defendants move to dismiss the claims against them for lack of subject-matter jurisdiction. Diego Beekman argues that this Court lacks jurisdiction over any aspect of this suit because, as a landlord-tenant dispute, it must be heard in state court. (Dkt. No. 52 at 6–7.) Alternatively, it argues that this Court should exercise its discretion to abstain from taking jurisdiction in light of the pending state-court proceedings. (Dkt. No. 52 at 11–14.) The City Defendants, in turn, raise the more limited jurisdictional argument that the

single Section 1983 claim asserted against them must be dismissed because Plaintiffs lack standing to bring it. (Dkt. No. 45 at 5–6.)

1.      **Nature of the Dispute**

Diego Beekman argues that this action must be dismissed from the outset because this Court "lacks subject matter jurisdiction . . . over a landlord-tenant dispute." (Dkt. No. 52 at 6.)

Congress has conferred on the federal district courts jurisdiction over "all civil actions arising under" federal law, 28 U.S.C. § 1331, and over state-law claims that are "so related to" those federal claims "that they form part of the same case or controversy," *id.* § 1367(a). Where a complaint expressly alleges a right to relief under federal law, the case arises under federal law unless the federal claim is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as to not involve a [genuine] federal controversy." *Oneida Indian Nation of N.Y. v. Oneida Cty.*, 414 U.S. 661, 666 (1974).

While "federal courts do not [generally] have subject matter jurisdiction over state eviction actions or other landlord-tenant matters," *Oliver v. N.Y.C. Hous. Auth.*, No. 10 Civ. 3204, 2011 WL 839110, at *3 (E.D.N.Y. Mar. 2, 2011), this is because such matters typically arise under state law. Where a colorable federal claim *does* arise in the context of a housing dispute, however, nothing about the dispute's factual underpinnings relieves a federal court of its "virtually unflagging obligation . . . to exercise the jurisdiction given [it]." *Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 91 (2d Cir. 2006) (alterations in original) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)); *see also Oliver*, 2011 WL 839110, at *3 (recognizing that a federal court may take jurisdiction over a Section 1983 claim arising in the housing context).

Here, Plaintiffs have asserted a right to relief under Section 1983, a federal statute, and their state-law claims "arise out of the same . . . policies and practices" as does their federal

claim. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).

Plaintiffs have therefore properly invoked this Court's federal-question jurisdiction unless their

Section 1983 claim proves to be "completely devoid of merit." *Oneida Indian Nation*, 414 U.S.

at 666. The Court addresses the merits of Plaintiffs' Section 1983 claim below, but the mere fact

that this case arises out of a landlord-tenant dispute does not deprive this Court of jurisdiction.

### 2. Abstention

Diego Beekman next argues that even if this Court may exercise jurisdiction here, it

should exercise its discretion to abstain from doing so in light of the fact that Plaintiffs are

parties to currently pending state-court actions that involve similar issues. (Dkt. No. 52 at 11–

14.) In connection with this argument, Diego Beekman invokes two distinct abstention

doctrines. First, it invokes the doctrine that has emerged from *Younger v. Harris*, 401 U.S. 37

(1971), and its progeny. (Dkt. No. 52 at 12–13.) Second, it invokes the doctrine described in

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). (Dkt. No. 52

at 11–14.)

### a. *Younger* Abstention

The *Younger* doctrine, broadly speaking, requires abstention when "(1) there is a pending

state proceeding, (2) that implicates an important state interest, and (3) the state proceeding

affords the federal plaintiff an adequate opportunity for judicial review of his or her federal . . .

claims." *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003). But

not every pending state proceeding is sufficient to trigger *Younger*. As the Supreme Court has

explained, *Younger* abstention is triggered only by truly "exceptional" sorts of state proceedings,

including "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings

involving certain orders that are uniquely in furtherance of the state courts' ability to perform

their judicial functions.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 368 (1989)).

Diego Beekman suggests that the state housing-court proceedings pending here merit *Younger* abstention, but it offers no argument as to why. A routine non-payment action filed by a private landlord in state housing court neither implicates "state courts' ability to perform their judicial functions," *id.*, nor enjoys significance equivalent to that of a state criminal or civil enforcement proceeding, *see Greer v. Mehiel*, No. 15 Civ. 6119, 2016 WL 828128, at *7 n.6 (S.D.N.Y. Feb. 24, 2016) (rejecting the argument that *Younger* abstention applies where an eviction action is pending in state court). *Younger* abstention is inappropriate here.

### b. *Colorado River* Abstention

The more flexible *Colorado River* doctrine provides that in "exceptional" circumstances "reasons of wise judicial administration" can counsel in favor of abstention, *Colo. River*, 424 U.S. at 818, if "substantially the same parties are contemporaneously litigating substantially the same issue in another forum," *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998)). To determine whether to abstain pursuant to *Colorado River* in the face of "parallel state-court litigation," a court considers at least six factors:

> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Id.* at 100–01 (quoting *Woodford v. Cmty. Action Agency of Greene Cty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001)). In evaluating these factors, "the balance is heavily weighted in favor of the

exercise of jurisdiction," *id.* at 100 (quoting *Woodford*, 239 F.3d at 522), and "[o]nly the clearest of justifications will warrant [abstention]," *id.* at 101 (quoting *Colo. River*, 424 U.S. at 819). Accordingly, "[w]here a *Colorado River* factor is facially neutral, that 'is a basis for retaining jurisdiction, not for yielding it.'" *Id.* (quoting *Woodford*, 239 F.3d at 522).

Diego Beekman has not demonstrated exceptional circumstances that warrant abstention. As an initial matter, the housing-court actions pending here might not represent "parallel state-court litigation" that triggers *Colorado River* in the first place. *Id.* at 100. For one thing, the City Defendants are not party to the state proceedings. *See German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 563 (S.D.N.Y. 1995) (holding that a state proceeding was not "concurrent" to a federal proceeding "involv[ing] different parties"). And although the claims in the instant case overlap with the issues presented in the housing-court actions, Diego Beekman has not shown that the "constitutional questions" presented here "ha[ve] . . . been raised in the state actions." *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 603 (2d Cir. 1988). While acknowledging that "[p]erfect symmetry of parties and issues is not required" to render two proceedings parallel for purposes of abstention, the Court is mindful that "[a]ny doubt regarding the parallel nature of a federal and state action should be resolved in favor of the exercise of federal jurisdiction." *Shields v. Murdoch*, 891 F. Supp. 2d 567, 577 (S.D.N.Y. 2012) (quoting *In re Comverse Tech., Inc.*, No. 06 Civ. 1849, 2006 WL 3193709, at *2 (E.D.N.Y. Nov. 2, 2006)).

Moreover, even if the Court treats the pending state-court actions as parallel to the instant suit, the *Colorado River* factors do not weigh so heavily in Diego Beekman's favor as to warrant recourse to the "generally disfavored" practice of abstention. *Niagara Mohawk*, 673 F.3d at 100. As for the first two factors, the instant case involves no physical "res," *see Mai Basic Four, Inc. v. 820 Second Ave. Assocs.*, No. 85 Civ. 2094, 1985 WL 2035, at *4 (S.D.N.Y. July 15, 1985)

(finding this factor "inapplicable" in an eviction proceeding), and the parties agree that state and federal court are equally convenient (Dkt. No. 52 at 13; Dkt. No. 55 at 18). Those two factors, then, are neutral and thus weigh against abstention. *See Niagara Mohawk,* 673 F.3d at 101.

The next two factors—the need to avoid piecemeal litigation and the order in which the actions were filed—do weigh in Diego Beekman's favor, but not overwhelmingly so. After all, the "[three] separate [state-court] actions . . . are already in some sense 'piecemeal,'" and although those actions were initiated prior to this federal suit, Diego Beekman has offered no indication that any of them "ha[ve] been resolved or appear[] close to disposition." *Id.* at 102.

The final two factors—whether federal law provides the rule of decision and whether state procedures are adequate—weigh against Diego Beekman. Plaintiffs seek relief under a federal statute, and "the presence of federal-law issues must always be a major consideration weighing against" abstention. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 (1983). While Diego Beekman claims that state-law issues "predominate" in the instant case (Dkt. No. 52 at 13), it has not established that those issues are "novel or particularly complex," *Vill. of Westfield v. Welch's*, 170 F.3d 116, 124 (2d Cir. 1999), so as to create the "rare circumstance[]" in which the "presence of state-law issues may weigh in favor of [abstention]," *Moses H. Cone*, 460 U.S. at 26. And Diego Beekman offers no response to Plaintiffs' contention that they will be unable to obtain declaratory or injunctive relief—or to conduct adequate discovery—in state housing-court proceedings. (Dkt. No. 55 at 19.)

Considering these factors in their totality, the Court declines to take the exceptional step of abstaining from the adjudication of a case that is properly before it.

### 3.     Standing

Finally, the City Defendants argue that even if the Court has subject-matter jurisdiction over Plaintiffs' dispute with Diego Beekman, the Court lacks jurisdiction over the single claim

Plaintiffs have asserted against them because Plaintiffs lack standing to bring that claim. First, the City Defendants argue that Plaintiffs lack constitutional standing because Plaintiffs are not alleged to have suffered any concrete injury that is traceable to the City Defendants' conduct. (Dkt. No. 45 at 5–6.) Second, the City Defendants argue that Plaintiffs are not party to the Regulatory Agreement and so lack prudential standing to enforce its terms. (Dkt. No. 62 at 2–4.)

### a. Constitutional Standing

Article III of the United States Constitution limits federal courts' adjudicatory power to "the resolution of cases and controversies." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008). This limitation requires that the party invoking federal jurisdiction have "standing," *i.e.*, some personal stake in the litigation. *Id.* In order to establish standing, a plaintiff "must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Id.* at 733.

Here, Plaintiffs plausibly allege that they suffered, among other things, financial injury in the form of excess rent charged by Diego Beekman. *See Carter*, 822 F.3d at 55 ("Any monetary loss suffered by the plaintiff satisfies [standing's injury] element . . . ."). And Diego Beekman's ability to inflict this financial injury plausibly stems at least in part from the City Defendants' failure to designate Plaintiffs as Cooperating Tenants. After all, such a designation would have bound Diego Beekman to comply with the Regulatory Agreement's special rent caps.[5] *See id.* at

---

[5] Plaintiffs' complaint alleges that the City Defendants "fail[ed] to notify Plaintiffs if they ha[d] been determined to be Cooperating Tenants." (Compl. ¶ 83.) In their brief opposing the City Defendants' motion to dismiss, however, Plaintiffs have clarified this allegation. Rather than alleging that the City Defendants failed only to provide *notice* of a determination, Plaintiffs allege that the City Defendants failed to *make* any determination one way or the other in the first place. (Dkt. No. 54 at 12.) The Court therefore need not decide whether the failure to provide Plaintiffs with notice of a Cooperating Tenant determination that had actually been made would, standing alone, be sufficiently connected to Plaintiffs' financial injury to support causation.

55–56 ("A defendant's conduct that injures a plaintiff but does so indirectly, after intervening conduct by another person, may suffice for Article III standing.").  Finally, an order of this Court requiring the City Defendants to make a determination as to Plaintiffs' eligibility for the Cooperating Tenant rent cap would plausibly redress the asserted injury.  Plaintiffs have alleged that they each meet the eligibility requirements (Compl. ¶¶ 50, 61, 75), and a positive eligibility determination would require Diego Beekman to reduce Plaintiffs' rents in line with the Regulatory Agreement (*See* Dkt. No. 56-3 at 10).  And were Diego Beekman to maintain Plaintiffs' rents above the cap despite a positive eligibility determination, such a determination would provide Plaintiffs with a legal basis for challenging those rents.

The Court has little trouble, then, concluding that Plaintiffs have constitutional standing to bring their Section 1983 claim against the City Defendants.[6]

### b.    Prudential Standing

While the Court concludes that it has constitutional authority to hear Plaintiffs' claim against the City Defendants, "[t]he doctrine of standing" requires the Court to ask in addition whether there are "prudential limitations" on exercising that authority.  *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004)).  Of relevance here, a plaintiff who is neither party to nor a third-party beneficiary of a particular contract typically lacks prudential standing to bring a suit aimed at enforcing the contract's terms.  *See id.* at 48–49.  This is because "[a] plaintiff generally

---

[6] Diego Beekman never challenges Plaintiffs' standing to proceed against it.  Given that Diego Beekman's alleged rent-cap violations are the direct cause of Plaintiffs' financial injury and that Plaintiffs seek through the instant suit to redress that injury, Plaintiffs clearly have constitutional standing to proceed against Diego Beekman as well.

must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Here, the sole claim against the City Defendants arises out of their alleged failure to issue a Cooperating Tenant determination. (Compl. ¶ 83.) The supposed duty to issue such a determination, in turn, arises out of the City's Regulatory Agreement with Diego Beekman. According to the City Defendants, Plaintiffs are neither parties to nor third-party beneficiaries of that agreement and so lack standing to sue for its enforcement. (Dkt. No. 62 at 2–4.)

Even assuming, as the City Defendants suggest, that Plaintiffs have no rights under the Regulatory Agreement, dismissal for lack of prudential standing is unwarranted. In their sole cause of action against the City Defendants, Plaintiffs invoke "[*their*] *own* legal rights and interests" under the Due Process Clause, *Warth*, 422 U.S. at 499 (emphasis added), and do not attempt to enforce the Regulatory Agreement directly through, for example, a breach of contract claim. Of course, it may be that the scope of Plaintiffs' enforceable rights, if any, under the Regulatory Agreement bears on the question of whether they have plausibly alleged a violation of their due-process rights. *See, e.g.*, *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248–50 (7th Cir. 1994) (rejecting a plaintiff's efforts to rely on a contract to which he was neither party nor third-party beneficiary to establish a property interest entitled to constitutional due-process protection). But such considerations go to the merits of Plaintiffs' constitutional claim and not to the question of Plaintiffs' standing to bring that claim.[7]

---

[7] This conclusion may appear to be in tension with *Reiner v. West Village Associates*, 600 F. Supp. 233, 238–39 (S.D.N.Y. 1985), in which the court dismissed several unjust-enrichment claims, as well as an associated federal due-process claim, for lack of prudential standing where the claims were predicated on defendants' alleged violation of a regulatory agreement to which plaintiffs were neither parties nor third-party beneficiaries, *see id.* at 238–39. But although the district court in *Reiner* spoke in terms of standing, the Second Circuit, in affirming, understood the district court to have "held that the [plaintiffs] had [no] *right of action*" to enforce the

Accordingly, this Court concludes that Plaintiffs have prudential standing to assert their Section 1983 claim against the City Defendants.[8]

## B.        Section 1983 (Count One)

Assured of its subject-matter jurisdiction, the Court now turns to the substance of Plaintiffs' allegations. The first count of Plaintiffs' five-count complaint claims that Defendants violated Plaintiffs' constitutional due-process rights and seeks relief pursuant to Section 1983. (Compl. ¶¶ 80–84.) Both Diego Beekman and the City Defendants contend that this count must be dismissed for failure to state a claim. (Dkt. No. 45 at 7–9; Dkt. No. 52 at 7–11.)

Section 1983, as relevant, offers a remedy for "the deprivation of any rights, privileges, or immunities secured by the [United States] Constitution" under certain circumstances. 42 U.S.C. § 1983. To make out a procedural Due Process Clause claim eligible for relief under this statute, Plaintiffs must plausibly allege that they "possessed a protected liberty or property interest, and that [they were] deprived of that interest without due process."[9] *McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001) (quoting *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998) (per curiam)). Furthermore, "[b]ecause the United States Constitution regulates

_____

agreement at issue. *Reiner v. W. Vill. Assocs.*, 768 F.2d 31, 32 (2d Cir. 1985) (per curiam). And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (alteration in original) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)).

[8] Of course, Plaintiffs do bring contract claims against *Diego Beekman* directly under the Regulatory Agreement, the Deed, and the HOME Agreement. (Compl. ¶¶ 85–87.) Because the Court declines to exercise jurisdiction over those claims for independent reasons, *see infra* Section III.C., the Court need not determine whether Plaintiffs have prudential standing to assert them.

[9] It appears that Plaintiffs do not intend to raise a substantive due-process claim. To the extent that they do intend to raise such a claim, they have failed to allege that Defendants have engaged in an "abuse of power" that "shocks the conscience" to the degree necessary to establish liability. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

only the Government, not private parties," Plaintiffs must also establish that Defendants'

"challenged conduct constitutes state action." *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir.

2012) (quoting *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005)).[10]

Defendants argue that Plaintiffs have failed to state a viable Section 1983 claim because

(1) with respect to the City Defendants, Plaintiffs have failed to plausibly allege the deprivation

of a protected property interest (Dkt. No. 45 at 7–9); (2) with respect to Diego Beekman,

Plaintiffs have failed to plausibly allege that the challenged conduct represents state action (Dkt.

No. 52 at 8–10); and (3) Plaintiffs' Section 1983 claims are time-barred (Dkt. No. 52 at 7–8).

The Court agrees with Defendants on the first two points and so does not reach the third.

### 1.     Deprivation of a Property Interest

For Plaintiffs to establish that Defendants have "deprived [them] of property without due

process, [they] must first identify a property right, second show that the state has deprived [them]

of *that* right, and third show that the deprivation was effected without due process." *Mehta v.

Surles*, 905 F.2d 595, 598 (2d Cir. 1990) (per curiam).  In its opening brief, Diego Beekman

makes no argument that Plaintiffs have failed to allege the deprivation of a constitutionally

protected property interest.  The Court therefore assumes without deciding that Plaintiffs have

plausibly alleged that Diego Beekman's alleged actions of charging excess rent and failing to

notify Plaintiffs of the pertinent rent caps effected the deprivation of a protected property right.[11]

---

[10] In addition, Section 1983 may be invoked only against a defendant who has acted
"under color of state law." *Fabrikant*, 691 F.3d at 206.  The Supreme Court has explained that
any conduct that "satisfies the state-action requirement of the Fourteenth Amendment . . . also
constitutes action 'under color of state law' for [Section] 1983 purposes." *Brentwood Acad. v.
Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001) (quoting *Lugar v. Edmondson
Oil Co.*, 457 U.S. 922, 935 (1982)).

[11] Diego Beekman does fleetingly challenge Plaintiffs' claim to hold "a property interest
in receiving below market rents" in connection with its argument that Plaintiffs have failed to
allege a valid *substantive* due-process claim.  (Dkt. No. 52 at 10–11.)  And, in its reply brief,

The City Defendants, however, argue that *their own* alleged actions—*i.e.*, their failure to certify Plaintiffs as Cooperating Tenants or at least to notify Plaintiffs of any such certification—did not effect any deprivation of Plaintiffs' property rights. (Dkt. No. 45 at 7–9.) In response, Plaintiffs assert that they have a "right to have their initial rent capped" at the Cooperating Tenant levels under the Regulatory Agreement and that the City Defendants have, through their inaction, deprived them of that right. (Dkt. No. 54 at 17.)

For a sought-after benefit to constitute a property interest eligible for protection under the Due Process Clause, a plaintiff must "have a legitimate claim of entitlement to it" and not merely "an abstract need or desire" for it. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The existence and scope of any such entitlement is determined "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Broadly speaking, Plaintiffs make two arguments as to why they hold an enforceable property right in receiving the Cooperating Tenant designation that would make them eligible for the Regulatory Agreement's special rent cap. First, they suggest that the Second Circuit's decision in *Lopez v. Henry Phipps Plaza S., Inc.*, 498 F.2d 937 (2d Cir. 1974), controls the outcome here. (Dkt. No. 54 at 17.) In *Lopez*, the Second Circuit held that a tenant in a private housing project operated according to a regulatory agreement with HUD under the National Housing Act, 12 U.S.C. § 1701 *et seq.*, had a protected property interest in continued occupancy

---

Diego Beekman makes a two-sentence argument contending that Plaintiffs have failed to allege the deprivation of a protected property right in connection with their procedural due-process claim. (Dkt. No. 60 at 5.) Because the Court concludes that the Section 1983 claim against Diego Beekman must be dismissed for other reasons, *see infra* Section III.B.2., the Court need not determine whether this argument has been adequately preserved and, if so, whether it has merit.

and so was entitled to due-process protections before being denied an opportunity to renew her lease, *see Lopez*, 498 F.2d at 943. But the tenant in *Lopez* derived her entitlement from "the penumbras of the Federal Housing and Development Act and the [general] custom" of offering tenants a chance to renew following expiry of a lease term. *Id.* Plaintiffs here have identified neither a statutory nor a customary right to any given rental arrangement. *See id.*at 942 (leaving open the question of "what, if anything, due process requires with respect to rent increases").

Second, Plaintiffs argue that their rights emerge from the Regulatory Agreement itself. (Dkt. No. 54 at 17–18.) Because Plaintiffs are not parties to that agreement, however, they must establish some claim of right to its enforcement under state law or otherwise. *See, e.g.*, *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1177 (10th Cir. 2016) (acknowledging that an entity that "is not a party to [a] contract . . . cannot [typically] claim a property interest arising out of that contract"). As relevant here, New York law provides that "an intended beneficiary of [a] contract . . . is entitled to enforce it," even if the beneficiary is a non-party. *Nepco Forged Prods., Inc. v. Consol. Edison Co. of N.Y., Inc.*, 470 N.Y.S.2d 680, 681 (App. Div. 2d Dep't 1984). So, the argument runs, as long as Plaintiffs are intended third-party beneficiaries of the Regulatory Agreement, they hold a protectable property interest in the benefits it assures them.

Under New York law, a party seeking to establish status as a third-party beneficiary must show "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983); *see also Leavitt-Berner Tanning Corp. v. Am. Home Assurance Co.*,

516 N.Y.S.2d 992, 995 (App. Div. 3d Dep't 1987) ("A party who seeks the status of a third-party beneficiary under a contract has the burden of demonstrating that he has enforceable rights thereunder.").  Typically, "the parties' intent to benefit the third party must be apparent from the face of the contract," and "[a]bsent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent." *LaSalle Nat'l Bank v. Ernst & Young LLP*, 729 N.Y.S.2d 671, 676 (App. Div. 1st Dep't 2001).

Courts have not spoken with a single voice on the question of whether tenants are considered third-party beneficiaries of regulatory agreements that impose duties on private landlords.  *Compare, e.g.*, *Reiner v. W. Vill. Assocs.*, 768 F.2d 31, 33 (2d Cir. 1985) (per curiam) (concluding under New York law that tenants were not third-party beneficiaries of the rent controls established by a landlord's regulatory agreement with HUD), *with, e.g.*, *Green v. Konover Residential Corp.*, No. 3:95 Civ. 1984, 1997 WL 736528, at *10 (D. Conn. Nov. 24, 1997) (concluding that "no one [is] more intended as a beneficiary" of a HUD contract's requirement that a landlord keep up safe and sanitary conditions "than the low-income tenants for whose benefit" the landlord's premises were maintained).  This divergence arises in no small part from the fact that "[w]hether parties are third party beneficiaries of a given contract depends on the specific facts of who the [putative] third parties are and what the contract contains." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 620 F. Supp. 806, 810 (S.D.N.Y. 1985); *see, e.g.*, *Mendel v. Henry Phipps Plaza W., Inc.*, 6 N.Y.3d 783, 786–87 (2006) (rejecting tenants' contention that they were third-party beneficiaries under a regulatory agreement that "explicitly negate[d] any intent to permit its enforcement by third parties").

For purposes of resolving the City Defendants' motion, this Court need not opine broadly on whether Plaintiffs enjoy *any* enforceable rights under the Regulatory Agreement.  Rather, the

Court need only determine whether the Regulatory Agreement confers upon Plaintiffs the specific property right upon which they claim the City Defendants have infringed—*i.e.*, an enforceable third-party right to have the City Defendants certify them as Cooperating Tenants. *See Leavitt-Berner*, 516 N.Y.S.2d at 995 ("The third party is entitled only to those rights which the original parties to the contract intended the third party to have."); *see also Corely v. Jahr*, No. 11 Civ. 9044, 2014 WL 772253, at *7 (S.D.N.Y. Feb. 10, 2014) (concluding that a tenant plaintiff was not a regulatory agreement's intended beneficiary as to certain claims but leaving open the possibility that he might enjoy beneficiary status as to others). The Court concludes that the Regulatory Agreement does not confer that specific property right.

The express purpose of the Regulatory Agreement is to describe the obligations that Diego Beekman has assumed as consideration for a tax exemption approved by the New York City Council. (Dkt. No. 56-3 at 6.) Among those obligations is a duty to restrict the amount of rent it charges its tenants, with greater restrictions placed on the rent charged to Cooperating Tenants. (Dkt. No. 56-3 at 10–11.) It is in this context that the Regulatory Agreement provides: "HPD shall determine whether a particular tenant is a Cooperating Tenant or a Non-Cooperating Tenant . . . and shall notify [Diego Beekman] of its determination, which shall be conclusive." (Dkt. No. 56-3 at 11.) In other words, the parties to the Regulatory Agreement defined the scope of Diego Beekman's obligations by establishing that a special rent cap would go into effect in the event that HPD makes a Cooperating Tenant determination. But nowhere did the parties demonstrate an intent to require HPD to make that determination in a particular way, or to create any avenue for compelling HPD to make a determination or for challenging such a determination once made. To the contrary, the parties anticipated that HPD's determinations as to Cooperating

Tenant status would be "conclusive" (*id.*),[12] and that "[a]ll determinations to be made by HPD or the City in accordance" with the Regulatory Agreement would be "in the sole discretion of HPD" (Dkt. No. 56-3 at 14).

To be sure, Plaintiffs broadly characterize their supposed third-party right under the Regulatory Agreement as the "right to have their initial rent . . . capped" and not merely as the right to a Cooperating Tenant designation. (Dkt. No. 54 at 17.) But even assuming that Plaintiffs do indeed enjoy this broader right under the agreement, their claim against the City Defendants fails nonetheless. Any right to a Cooperating Tenant rent cap is triggered only by a Cooperating Tenant designation, which—as the Court has just explained—Plaintiffs enjoy no enforceable right to receive. And to the extent that Plaintiffs allege that their rents exceeded any other applicable rent cap, they have not alleged that the City Defendants played any role in establishing those rents. In any event, the Regulatory Agreement explicitly provides that the City may "in its sole and absolute discretion" elect to waive enforcement. (Dkt. No. 56-3 at 13.) Whatever the scope of their third-party rights, if any, against *Diego Beekman* under the Regulatory Agreement, then, Plaintiffs enjoy no expectation as of right that *the City* will act to assure them any given rental arrangement. *Cf. Reiner*, 768 F.2d at 34 (holding that HUD's authorization of a private landlord's proposed rent increase did not deprive tenants of a property interest because the regulatory agreement that governed HUD's relationship with the landlord gave the tenants no "legitimate expectation" that HUD would disallow such increases); *Grace Towers Tenants Ass'n v. Grace Hous. Dev. Fund Co.*, 538 F.2d 491, 494 (2d Cir. 1976) (similar).

---

[12] To the extent that Plaintiffs' claim against the City Defendants is based on the City Defendants' failure to notify them of their Cooperating or Non-Cooperating Tenant status—as opposed to the City Defendants' failure to determine Plaintiffs' status in the first place, *but see supra* note 5—the Court likewise notes that nothing in the Regulatory Agreement suggests an intent to require HPD to provide tenants with such notice.

The Court therefore concludes that Plaintiffs have failed to plausibly allege that the City Defendants have deprived them of a constitutionally protected property interest. Accordingly, Plaintiffs' Section 1983 claim is dismissed for failure to state a claim as to those defendants.

### 2. State Action

With the City Defendants now out of the picture, the Court turns to consider the plausibility of Plaintiffs' Section 1983 claim against the remaining defendant, Diego Beekman. As explained above, the Court assumes without deciding that Plaintiffs have adequately alleged that Diego Beekman has violated their protected property rights by charging excess rents and failing to notify them of the availability of various rent caps. Diego Beekman argues that Plaintiff's Section 1983 claim against it must nonetheless be dismissed for failure to plausibly allege that this violation constituted state action. (Dkt. No. 52 at 8–10.)

Section 1983's state-action requirement operates to exclude "merely private conduct" from the statute's remedial sweep. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). However, "the actions of a nominally private entity" such as Diego Beekman may be "attributable to the state" for Section 1983 purposes when, among other things, "the entity's functions are 'entwined' with state policies" or "the entity 'has been delegated a public function by the [s]tate.'" *Sybalski v. Indep. Grp. Home Living Program*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

Here, Plaintiffs contend, Diego Beekman's decision to charge excessive rent, as well as its failure to provide notice of the rent caps, are attributable to the state under both an entwinement theory and a public-function theory. (Dkt. No. 55 at 14–17.)

### a. Entwinement

The actions of a private entity can constitute state action where "[t]he State has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). That said, "[i]t is not enough . . . for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*.'" *Sybalski*, 546 F.3d at 257–58 (quoting *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977) (per curiam)). For a private actor's conduct to be attributable to the state, then, the specific conduct at issue must typically be "compelled or [at least] influenced by . . . state regulation." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). In other words, "the crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not . . . between the governmental entity and the private *actor*." *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 364 (S.D.N.Y. 2001); *see also Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 351 (E.D.N.Y. 2013) ("To establish joint action, a plaintiff must show that [a] private citizen and [a] state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." (quoting *Bang v. Utopia Rest.*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996))).

Here, Plaintiffs point out that Diego Beekman receives public funds and tax exemptions in exchange for providing low-income housing, and that HPD has the authority to approve or replace the Complex's managing agent and the directors that sit on Diego Beekman's Board of Directors. (*See* Dkt. No. 56-3 at 12.) But the "[a]cts of . . . private [entities] do not become acts

of the government" simply because those entities receive state funding for providing a public service. *Rendell-Baker*, 457 U.S. at 841. And Plaintiffs' allegations forge no link between HPD's limited involvement in Diego Beekman's management and the specific rent practices that form the basis for Plaintiffs' due-process claim.

To the contrary, insofar as the City Defendants are alleged to have played any role in Diego Beekman's challenged practices, it was to discountenance them. After all, the basis of Plaintiffs' Section 1983 claim against Diego Beekman is that it breached duties *the City itself* demanded as a condition of state funding and tax benefits.[13] *See Young*, 152 F. Supp. 2d at 364 (finding no state action where a private landlord's challenged policy was "[n]either compelled [n]or influenced by the regulatory scheme under which it operated"). Plaintiffs have given this Court no plausible basis upon which to base the counterintuitive conclusion that Diego Beekman's alleged breach of its commitments to the City may be imputed to the very party to whom those commitments are owed.

### b. Public Function

Even absent governmental entwinement, a private entity's actions can constitute state action where that entity performs a public function, or in other words wields "a power 'traditionally exclusively reserved to the State.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). The inquiry into whether a private entity does so "focuses not on whether the activity delegated to the private entity has been regularly performed by governments, but instead on whether the activity

---

[13] Of course, Plaintiffs have alleged that the City Defendants, by failing to certify them as Cooperating Tenants, enabled Diego Beekman to charge rents that exceed the corresponding rent caps. However, to the extent that Plaintiffs were never designated Cooperating Tenants, Diego Beekman was authorized to charge such rents (*see* Dkt. No. 56-3 at 10–11), and so did not violate any rights Plaintiffs might enjoy under the Regulatory Agreement by doing so.

historically has been 'an exclusive prerogative of the sovereign.'" *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014) (quoting *Flagg Bros.*, 436 U.S. at 160). Accordingly, where a service has "historically [been] provided by an array of non-state actors," the service does not represent a public function. *Id.*

Here, "the provision of housing, for the poor or for anyone else, has never been the exclusive preserve for the state, but has been left to a regulated, and occasionally subsidized, private marketplace." *Young*, 152 F. Supp. 2d at 365. Indeed, Plaintiffs never argue to the contrary. Instead, citing *Ressler v. Pierce*, 692 F.2d 1212 (9th Cir. 1982), an out-of-circuit case that did not address the issue of state action, Plaintiffs contend that Diego Beekman has under the HOME Agreement and the Regulatory Agreement assumed the "traditional and inherently public" power to make "decisions regarding eligibility for public benefits" (Dkt. No. 55 at 16). But even assuming that Plaintiffs have correctly identified a traditional public function—and that the rent caps at issue constitute a public benefit—Plaintiffs' own claims are predicated on the view that the state has *not* delegated this power to Diego Beekman. To the contrary, Plaintiffs seek to enforce against Diego Beekman the terms of several regulatory agreements that, in Plaintiffs' view, *require* Diego Beekman to provide them with the benefit they seek.

Under the public-function theory, too, then, Plaintiffs have failed to plausibly allege that Diego Beekman's alleged breach of the various agreements that govern its rental practices constitutes state action that can form the basis of a Section 1983 claim. Accordingly, the Court concludes that Plaintiffs' federal claim against Diego Beekman must be dismissed.

### C. State-Law Claims (Counts Two through Five)

Having concluded that Plaintiffs' complaint fails to state a federal Section 1983 claim against either the City Defendants or Diego Beekman, the Court must decide whether to exercise pendent jurisdiction over Plaintiffs' remaining state-law claims. Typically, "if the federal claims

are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Diego Beekman argues that the Court should follow that ordinary course here (Dkt. No. 52 at 14), and Plaintiffs do not argue otherwise. Accordingly, this Court declines to exercise jurisdiction over Plaintiffs' state-law claims and therefore dismisses them without prejudice.

## IV.    Conclusion

For the foregoing reasons, Diego Beekman's and the City Defendants' motions to dismiss the claims against them are GRANTED.

The Clerk of Court is directed to close the motions at Docket Numbers 43 and 50 and to close this case.

SO ORDERED.

Dated: January 24, 2019
       New York, New York

_____
                    J. PAUL OETKEN
              United States District Judge